[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The above two captioned cases, which have been consolidated for trial, are appeals from the amount of compensation offered by the defendant, Urban Redevelopment Commission (URC), of Stamford. The defendant exercised its power of eminent domain as authorized by General Statutes § 8-128 to obtain certain properties in the Gateway District of Stamford, located near the railroad station, and consisting of approximately twelve acres.
The plaintiff, Clearwater Plaza Limited Partnership (Clearwater Plaza), owned two of the four parcels that are the subject of these appeals. The first is a ten-story office building, located at 655 Washington Boulevard, known as Station Plaza.[1] This plaintiff also owned a parking lot for the CT Page 13239 office building located at 683 Washington Boulevard.[2] The other plaintiff, Charles Mallory, Trustee, owned property at 20 Beehler Street, containing a small two-story commercial building built in 1952 and used by the Salvation Army at the time of the taking.[3] Malloy, Trustee, also owned property at 695 Washington Boulevard, another parking lot for Station Plaza.[4]
Clearwater Plaza and Mallory, Trustee, are hereinafter referred to collectively as plaintiffs.
The use of the premises for an office building and parking lots were permitted uses in the zone in which the subject property was located at the time of the taking, CC-N, and it was agreed that such uses were the highest and best uses for the property at that time. Station Plaza was "imploded" early one morning in the summer of 1997, and now there is park-like open space on the side of the new Swiss Bank building where Station Plaza was formerly situated.
Pursuant to General Statutes § 8-129, the defendant, URC, filed with the clerk of this court on July 13, 1995, a notice of condemnation and a statement of compensation for the Clearwater Plaza property in the amount of $4,861,960, and $684,040 for the Mallory property, a total of $5,546,000, which sum was deposited with the clerk on that date. The certificates of taking were filed on August 7, 1995, and August 8, 1995. The subject premises were taken by the defendant as part of a condemnation of a number of properties in an area consisting of approximately twelve acres in order to provide a new headquarters for the Swiss Bank. The two plaintiffs appealed from these awards pursuant to General Statutes § 8-132, which authorizes an appeal by one who claims to be aggrieved by an inadequate award of compensation. Thus, the issue in these cases is whether the plaintiffs are entitled to additional compensation over and above the compensation already offered by the defendant, URC.
These appeals were tried to the court, and each party presented, as expert witnesses, an appraiser and his detailed appraisal. The appraiser for the plaintiff, James Levy, testified that in his opinion the subject properties were worth $10,100,000. The defendant's primary appraiser, James Moran, testified that the properties were worth $5,546,400, the amount that the URC offered to the plaintiffs.
The court's role is to determine "just compensation" for the "persons entitled thereto." General Statutes § 8-128. "The CT Page 13240 amount that constitutes just compensation is the market value of the condemned property when put to its highest and best use at the time of the taking. In determining market value, it is proper to consider all those elements which an owner or a prospective purchaser could reasonably urge as affecting the fair price of the land. The fair market value is the price that a willing buyer would pay a willing seller based on the highest and best possible use of the land assuming, of course, that a market exists for such optimum use." (Citations omitted; internal quotation marks omitted.) Robinson v. Westport, 222 Conn. 402, 405, 610 A.2d 611
(1992); see also Feigenbaum v. Waterbury, 20 Conn. App. 148, 151,565 A.2d 5 (1989) ("The usual measure of just compensation is the fair market value or the price that would probably result from fair negotiations between a willing seller and a willing buyer, taking into account all the factors, including the highest and best or most advantageous use, weighing and evaluating the circumstances, the evidence, the opinions expressed by the witnesses and considering the use to which the premises have been devoted and which may have enhanced its value.")
After reviewing the testimony of the witnesses and the appraisal reports and other exhibits, studying the excellent and comprehensive briefs of the parties, and personally viewing the properties in April, 1997, as required by General Statutes § 8-132, the court is of the opinion that the fair market value of the Clearwater Plaza and Mallory, Trustee, properties was, at the time of taking by the defendant, $7,397,500. This figure was reached as follows.
A good starting point is to note that the office building in question was purchased in September, 1993, for $3,800,000. The Mallory properties were purchased in 1994 for $587,500. The defendant argues that combining these figures, and adding $48,500, spent for physical improvements to the building, totals $4,436,000, and that the plaintiffs are seeking $10,100,000, a tremendous profit in just about two years. Although this may seem to be a good point, its impact is lessened by the fact that the defendant's own appraiser, Mr. Moran, appraised the building in June, 1993, a few months before it was purchased, and determined its worth to be $4,500,000. Clearwater Plaza purchased the office building from an agent of a bank foreclosing its mortgage, and obviously obtained a favorable price. Furthermore, there was convincing evidence that between 1993, when the office building was purchased, and 1995 when it was taken by the defendant, the real estate market in Stamford rebounded from a low point to a CT Page 13241 much stronger market. An example is the vacancy rate, which dropped from 21.4% in the summer of 1993 to 18% in the summer of 1995.
In support of its position that the compensation offered to the plaintiffs represents fair market value, the defendant also urges consideration of the condition of the neighborhood and of the building itself. The defendant points out that the URC was authorized to condemn this area because of a finding by the city's legislative body and by the URC itself that the area was run-down, depressed, etc. This argument has not been given too much weight for two reasons. First, in August, 1994, almost a year before the taking, it was announced that Swiss Bank was relocating from New York City to this area in Stamford. If the surroundings were as blighted as the URC depicted, why would Swiss Bank purchase the property and erect its North American headquarters thereon? Second, the court, in connection with viewing the building, revisited the area in which the subject premises are located, and concluded that, generally speaking, the area at the time of the taking was a lot better than the URC urges. The building in question was very close to the Transportation Center and to I-95, and near several first class office buildings, including Champion International, just two blocks away. In short, it is understandable that Swiss Bank wanted to build its headquarters in this area because of its dynamic location near several transportation opportunities.
Secondly, as to the office building itself, the defendant makes much of the fact that it was classified technically as a Class B building, although the plaintiffs argue that it was a Class A- or a B+ building, on its way to a Class A building. The defendant's expert, Mr. Moran, stated that the building had a "high degree of external obsolescence." He did agreed, however, that the building was "an above-average quality Class B building" and had "easy access to the Stamford Transportation Center and exit 7 of I-95." In any event, the visit by the court left the definite impression of a very nice office building with some good amenities, including a cafeteria and a community room. Hence, the court does not agree with the defendant's characterizations of the area as run-down and somewhat shoddy and of the building as rather pedestrian.
Having come to those conclusions about the area and the building, and thus rejecting the amount of compensation offered to the plaintiffs by the URC, our task is to determine fair CT Page 13242 market value at the time of the taking by a review of the testimony and exhibits, supplemented by the personal inspection. Both appraisers employed a comparable sales or market data approach, but agreed that the income capitalization approach, using the discounted cash flow technique, was the preferred method to estimate fair market value. The problem is that using the same approaches to valuation, the two appraisers were $5,000,000 apart.
The plaintiffs' appraiser, Mr. Levy, testified that by using the sales comparison approach he valued the subject premises as worth $10,050,000. This witness used sales in 1995 of 2777 Summer Street, Three Stamford Landing, and 1010 Washington Boulevard, a sale in 1994 of Ten Stamford Forum, and a contract of sale for 70 Seaview Avenue entered into in 1995, to arrive at a figure of approximately $95 a square foot. This figure incorporates a number of adjustments based on the witness' conclusions regarding location, physical condition, character, parking and occupancy. Mr. Levy multiplied $95 per square foot by 105,000 gross square feet of the subject premises for a fair market value of $10,050,000.
Using the income capitalization approach based on market rent of $19.50 per square foot, and then increasing this figure by $1.00 per year and reaching a figure of approximately $23.50 per square foot, and employing the discounted cash flow technique of yield capitalization, the plaintiffs' expert arrived at a figure of $9,500,000, plus $600,000 for 20 Beehler Street,[5] or $10,100,000 total. In arriving at this figure, Mr. Levy employed a software program, office 2; Version 4.8, and factored in his opinion of market rent at the time, as well as operating expenses, vacancy rates, inflation, taxes, a discount rate, and a residual capitalization rate of 10%.
The defendant's appraiser, Mr. Moran, used the comparable sales approach to arrive at a figure of approximately $5,250,000. Mr. Moran referred to the comparable sale also used by Mr. Levy, of 1010 Washington Boulevard, sold in 1995 for approximately $46 per square foot, but he also analyzed two sales in 1994, four sales in 1993, and one in 1992. After making adjustments for location, size, condition, utilities, and occupancy, he arrived at a figure of $50 per square foot, and applying that number to the gross building area of 105,000 square feet, Mr. Moran arrived at a figure of $5,250,000 as the value of the subject building. CT Page 13243
Mr. Moran also used the discounted cash flow income approach. He determined that the per square foot market rental rate was $16.50. Using a capitalization rate of 10%, he reported that the value of the premises was $5,950,000, from which he subtracted $153,000 for remediation of some contamination on the Mallory property, for a final figure of $5,546,000, the amount offered by the URC.
With the reports of the two appraisers at such variance, the court determined to approach the question of valuation in a somewhat different manner. First, as to comparable sales, there were three such sales in 1995, the year of the taking, 2777 Summer Street, Three Stamford Landing and 1010 Washington Boulevard. Using these sales seems a better approach than factoring in sales from 1992, 1993, and 1994, when both experts agree that the market was not as viable as in 1995.[6] Also, both appraisers made numerous adjustments, both upwards and downwards, for factors such as location and condition, which introduce an element of subjectivity to their testimony and appraisals. This is reflected in the fact that one appraiser valued the property at about twice the amount the other appraiser reached, $95 per square foot, as contrasted with $50 per square foot.. Using a value of $69 per square foot, which is the average price per square foot of those three 1995 sales, and applying that figure to Station Plaza, with 105,000 gross square feet, the building was worth $7,245, 000 in 1995, the year of the taking, according to the market value approach.
Turning to the income approach, the starting point is the useable square feet of the subject building, which is 95,000, multiplied by a net rental value. The plaintiffs presented Ruth A. Agnese as a rebuttal witness. Ms. Agnese is an appraiser with thirteen years of experience and is a member of the Appraisal Institute (MAI). Noting that Mr. Levy had used a figure of $19.50 as market rent per square foot and that Mr. Moran used $16.50 per square foot, Ms. Agnese was asked to use a mid-point figure of $18.00 per square foot, which makes sense because of the difficulty in determining precisely the actual market rent at the time of the taking. Ms. Agnese then employed Mr. Moran's assumptions of five year leases and $12 per square foot for tenant fit-up, and arrived at a figure of $7,900,000 as the market value of the plaintiffs' property. Averaging this amount with the figure arrived at by using the market data approach, $7,245,000, the court's final figure for the fair market value of CT Page 13244 the subject premises is $7,572,500. Unpaid taxes in the amount of $175,000 must be subtracted for a final figure of $7,397,500.[7]
Thus, since this amount is more than the amount offered by the URC, the appeals of the plaintiffs are sustained pursuant to General Statutes § 8-132, and the plaintiffs should be awarded additional compensation of $1,851,500, to reflect the fair market value of their property on August 7/8, 1995, the dates of taking. The plaintiffs are also entitled to interest pursuant to General Statutes § 37-3c in the amount of 10% per year, which is deemed to be a reasonable sum, "from the date of taking to the date of payment." This statute also provides that interest should not run "on any funds deposited by the condemnor as compensation for the taking for the period after such deposit funds become available for withdrawal by the condemnee."
Costs are to be taxed pursuant to General Statutes § 8-133, and if the parties are unable to agree on the amount thereof, and/or on the amount of General Statutes § 37-3c
interest, this court will hold a supplementary hearing on these issues, which may be scheduled through the Caseflow Office.
So Ordered.
Dated at Stamford, Connecticut, this 17th day of November, 1998.
William B. Lewis, Judge